# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 20-1346V
UNPUBLISHED

| | |
|---|---|
| RENEE MAJERUS,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: June 16, 2023<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Howard Dale Mishkind, Mishkind Kulwicki Law Co., L.P.A., Cleveland, OH, for Petitioner.*

*Benjamin Patrick Warder, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On October 8, 2020, Renee Majerus filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration (SIRVA) resulting from adverse effects of an influenza (flu) vaccination she received on October 16, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Although Respondent conceded entitlement, the parties could not agree to damages, and so the matter was submitted to a "Motions Day" proceeding. For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$135,000.00 for her actual pain and suffering.**

## I.      Relevant Procedural History

Nearly two years after this case was initiated, Respondent filed his Rule 4(c) Report conceding that Petitioner was entitled to compensation. ECF No. 29. A ruling on entitlement was subsequently issued on June 7, 2022. ECF No. 30. The parties thereafter attempted to informally resolve damages but were unsuccessful. ECF No. 34, 37. Accordingly, I issued a scheduling order regarding the briefing of disputed damages issues. ECF No. 38. The parties filed their respective briefs (ECF Nos. 39 ("Br."), 41 ("Opp."), and 42 ("Resp.")), and agreed to argue their positions at a motions hearing, at which time I would decide the disputed damages issues. ECF. No. 44. That hearing was held on May 26, 2023,[3] and the case is now ripe for a determination.

## II.     Relevant Medical History

A complete recitation of the facts can be found in the Petition, the Rule 4(c) Report, and in the parties' respective pre-hearing briefs.

In summary, at the time of vaccination Ms. Majerus was a 42-year-old with a non-contributory medical history. Exhibit (Ex.) 17 at 1-2. Petitioner received a flu vaccine in her right deltoid on October 11, 2017, at her place of employment. Ex. 2 at 1.

On October 27, 2017, Petitioner saw an orthopedist, Dr. Irwin Mandel, for right shoulder pain for two weeks after receiving a flu shot in her right shoulder. Ex. 3 at 124. Petitioner was diagnosed with right rotator cuff tendonitis/bursitis after vaccination. *Id.* at 125. At that time, Petitioner rated her pain at 4/10 with activity. *Id.* at 124. Four weeks later, on November 30, 2017, Petitioner returned to Dr. Mandel indicating that her pain had gotten worse; although she had been taking ibuprofen and doing exercises, the pain affected her daily activities and her sleep. Ex. 15 at 4. Because of Petitioner's persistent symptoms, Dr. Mandel recommend an MRI evaluation. *Id.*

Ms. Majerus underwent an MRI on December 20, 2017, which revealed "severe tendinitis involving the distal infraspinatus tendon and associated minimal concealed linear partial interstitial tear. No full-thickness rotator cuff tear. There is underlying bone marrow edema at the insertion site. There is mild fluid within the subacromial/ subdeltoid

---

[3] At the end of the hearing held on May 26, 2023, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing. The transcript from the hearing is fully incorporated into this Decision. ECF No. 47.

bursa." Ex. 13 at 1-2. The next day, Petitioner returned to Dr. Mandel, at which time she decided to continue with a nonoperative plan, and to start formal physical therapy ("PT"). Ex. 15 at 9. Dr. Mandel recommended that Petitioner follow-up in two months and discussed the possibility of arthroscopic surgery and possible rotator cuff repair. *Id.* Petitioner received her first steroid injection at this visit. *Id.*

Ms. Majerus had a PT evaluation on March 2, 2018. Ex. 3 at 120. On evaluation, Petitioner presented with painful range of motion (ROM), weakness, and pain with activities of daily living (ADLs) and work activity. *Id.* It was indicated that Ms. Majerus would benefit from skilled therapy to improve functional impairments and ultimately improve functional abilities as listed in the goals. *Id.* at 121-122. After the PT evaluation, Petitioner did not immediately begin PT sessions due to difficulty with her workers' compensation claim. *See* Ex. 4 at 10, Ex. 17 at 5. Petitioner had an independent medical evaluation on May 22, 2018, in which the physician concluded that "it is highly unlikely that the needle was long enough or angled in such a way that it could have come in contact with her rotator cuff. Dr. Mandel's records speculate that the injection may have been given in the area of the teres minor, but the potential tear identified on MRI was localized to the infraspinatus tendon. Consequently, there is no reasonable way to relate the rotator cuff findings, identified on MRI, to the claimant's flu shot." Ex. 14 at 3.

On April 30, 2018, Ms. Majerus saw Dr. Todd Hochman at Westpark Occupational Medicine & Therapy. Ex. 4 at 11. At that visit, Petitioner complained of right shoulder pain, limited ROM and weakness throughout the right shoulder. *Id.* Petitioner reported that the steroid injection had helped, but the pain was recurring. *Id.* On June 11, 2018, and again on July 23, 2018, Petitioner returned to Dr. Hochman. Ex. 4 at 8-10. Petitioner expressed frustration with her workers' compensation claim, and Dr. Hochman noted that he disagreed with workers' compensation physician's findings. *Id.* On February 4, 2019, Ms. Majerus again returned to Dr. Hochman, indicating that her workers' compensation claim was now being recognized. Ex. 4 at 6. Petitioner also indicated that she was working at a lighter duty position of employment with a new employer. *Id.*

On April 4, 2019, Ms. Majerus presented for a follow-up with Dr. Mandel for right shoulder pain and to discuss surgery. Ex. 3 at 115-16. Petitioner wanted to proceed with surgery which was delayed because of her workers' compensation claim. *Id.* At this visit it was noted that Petitioner's condition had not improved, and Dr. Mandel recommended shoulder surgery. *Id.* On September 19, Petitioner returned to Dr. Mandel with pain rated at 6/10 at worst. Ex. 3 at 112. It was noted that Petitioner's surgery was canceled because of workers' compensation claim appeals. *Id.* Dr. Mandel stated that with her delay in treatment, Petitioner had persistent symptoms and exacerbation of symptoms. *Id.* at 113.

On November 5, 2019, Ms. Majerus underwent right arthroscopic shoulder surgery, subacromial decompression, acromioplasty, debridement partial thickness rotator cuff tear, and distal clavicle excision. Ex. 12 at 1. On November 14, 2019, at her first follow-up visit with Dr. Mandel post-surgery, Petitioner indicated that her pain was occasional, but improving and that she was taking ibuprofen and Percocet for pain with good relief. Ex. 3 at 109.

On November 18, 2019, Ms. Majerus underwent a post-operative PT evaluation. Ex. 3 at 106. At that time, she rated her pain at 0/10 at best and 4/10 at worst. *Id.* From November 18, 2019, through March 5, 2020, Petitioner attended a total of 31 PT sessions. *See id.* at 5-108. Petitioner self-discharged from PT on June 11, 2020, and continued on a home exercise program thereafter. *Id.* at 4-6.

Ms. Majerus returned to Dr. Mandel on April 6, 2020, five months status post-surgery. Ex. 3 at 8. Dr. Mandel noted that Petitioner was doing extremely well, and denied any problems other than occasional pectoral soreness. *Id.* Ms. Majerus was noted to be doing Pilates and planks without difficulty, and she was advised that she could resume full activities without restrictions and could return to work in the ICU at Main Campus without restrictions. *Id.* At that visit, her pain was rated at 0/10. *Id.* at 9. On May 6, 2020, Petitioner returned to Dr. Hochman indicating that she was doing a lot better, but still having weakness throughout the right shoulder and had not improved to baseline. She was advised to return in six to twelve months. Ex. 4 at 5.

## III.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594,

at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579, 489-90 (2013). In *Graves*, Judge Merrow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

## IV.    Appropriate Compensation for Petitioner's Pain and Suffering

In this case, Petitioner's awareness of her injury is not disputed, leaving only its severity and duration to be considered. In determining appropriate compensation for Petitioner's pain and suffering, I have carefully reviewed and considered the complete

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

record in this case. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and relied upon my experience adjudicating such cases.[5] My determination, however, is ultimately based upon the specific circumstances of this case.

Petitioner argues that "[t]he amount of compensation that should be awarded under the terms of the Vaccine Act[,] based upon the specific facts of the instant case and other well-reasoned and comparable fact patterns[,] warrants an award for pain and suffering of $170,000.00 . . . ." Br. at 2. Petitioner looked to comparative guidance for similar SIRVA cases where surgery was involved, including *Reed, Hooper, Lang, Nute*, and *Kelley* awarding damages between $120,000.00 and $195,000.00, respectively.[6] *Id.* at 12-16.

In particular, Petitioner points to *Reed* (in which $165,000.00 was awarded) as supportive of the requested award in this case. Br. at 12. But she generally asserts that this "case mandates an award above the median proffered SIRVA award ranges." *Id.* at 11. The record reveals that she "suffered for 2+ years before she could have surgery and the delay in performing the surgery was not due to any non-compliance on her behalf. She had to battle a worker's compensation system to get her surgery approved and in the interim she tried to work as an ICU nurse. When it became apparent that her injury was negatively impacting her career, she resigned and took a non-clinical position. Even after her surgery, she had 31 physical therapy sessions and while she made a 'good' recovery, her limitations are well documented herein and warrant an award greater than $160,000.00 for her past pain and suffering." *Id.* at 12. And she has continued to experience pain and reduced ROM that could not be alleviated with further treatment. *Id.* Petitioner asserts that her injury created unique challenges in her day-to-day life as a working mother of two children. *Id.* at 13.

In response, Respondent recommends a pain and suffering award $95,000.00. Opp. at 2,8. Respondent contends that there are important factual differences between

---

[5] Statistical data for all SIRVA cases resolved in SPU from inception through January 2020 as well as a brief description of any substantive decisions can be found in the following decisions: *Vinocur v. Sec'y of Health & Hum. Servs.,* No. 17-0598V, 2020 WL 1161173 (Fed. Cl. Spec. Mstr. Jan. 31, 2020); *Wilt v. Sec'y of Health & Hum. Servs.,* No. 18-0446V, 2020 WL 1490757 (Fed. Cl. Spec. Mstr. Feb. 24, 2020); *Smallwood v. Sec'y of Health & Hum. Servs.,* No. 18-0291V, 2020 WL 2954958 (Fed. Cl. Spec. Mstr. Apr. 29, 2020).

[6] *Reed v. Sec'y of HHS*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for past pain and suffering); *Hooper v. Sec'y of HHS*, No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. June 27, 2019) (awarding $185,000.00 for past pain and suffering); *Lang v. Sec'y of HHS*, No. 17-995V, 2018 WL 3681275 (Fed. Cl. Spec. Mstr. July 25, 2018) (awarding $195,000.00 for past pain and suffering); *Nute v. Sec'y of HHS*, No. 18-140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $125,000.00 for past pain and suffering); *Kelley v. Sec'y of HHS*, No. 18-140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $120,000.00 for past pain and suffering).

the instant case and *Hooper*, *Lang*, and *Reed* that make a much lower pain and suffering award appropriate in this case. *Id.* at 14.

In *Hooper*, for example, one of the petitioner's physicians noted that his left shoulder, pre-surgery, was "'nearly useless,'" and another of the petitioner's physicians evaluated him, post-surgery, as having lost 50% of his left arm function. Opp. at 14. But in this case, none of Ms. Majerus's physicians provided a prognosis of her SIRVA that approached the severity of those provided by the physicians in *Hooper*, and Ms. Majerus's most recent medical records indicated that her right shoulder pain substantially improved after her November 5, 2019 surgery. *Id.* Respondent also distinguishes this case from *Lang*, as the *Lang* petitioner underwent two surgeries not one. *Id.* Additionally, unlike the petitioners in *Lang* and *Reed*, Respondent contends that Ms. Majerus was not referred to a pain management specialist, and she was not regularly taking narcotic or opioid medication for her shoulder pain. *Id.* Respondent further asserts that Petitioner is not making claims for past lost wages or future lost wages in this case, and because of the speculative, uncorroborated statements contained in Petitioner's supplemental affidavit regarding her alleged work limitations, those statements should not be considered when determining Petitioner's award for pain and suffering damages. *Id.* at 15.

Instead, cases like *Shelton* and *Hunt* are more analogous to this case, and because of that, a lower pain and suffering award is appropriate.[7] Like the *Shelton* petitioner, Ms. Majerus had gaps in her receipt of medical treatment of more than six months (July 23, 2018, to February 4, 2019) and more than four months (April 26, 2019, to September 19, 2019). Opp. at 17. The fact that Ms. Majerus could cope with her right shoulder pain between gaps in treatment counsels in favor of a lower pain and suffering award. *Id.* Finally, Respondent asserts, unlike the *Shelton* petitioner (who received three steroid injections) and the *Hunt* petitioner (who received at least four steroid injections), Ms. Majerus received only one steroid injection. *Id.* at 16-18. Additionally, unlike the *Hunt* petitioner, who was still reporting significant shoulder pain six months after her surgery, Ms. Majerus's right shoulder had improved "quite a bit," although it was not yet back to baseline, six months after her surgery. *Id.* at 18.

Pursuant to my oral ruling on May 26, 2023 (which is fully adopted herein), **I find that $135,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**

As a general matter, an award of at least $100,000.00 is not automatically

---

[7] *Shelton v. Sec'y of HHS*, No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) (awarding $97,500.00 for past pain and suffering); *Hunt v. Sec'y of HHS*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 for past pain and suffering);

appropriate simply because arthroscopic surgery was involved. As noted by Respondent, in both *Shelton* and *Hunt*, surgery SIRVA cases, I awarded less than that amount. *Shelton*, 2021 WL 2550093, at *1, 9; *Hunt*, 2022 WL 2826662, at *1, 10. However, the fact that a petitioner must undergo arthroscopic surgery to alleviate her symptoms inherently suggests a greater level of pain and suffering, and/or more intrusive treatment. In addition, Program goals are generally served by creation of a few foundational rubrics that can be considered when faced with pain and suffering disputes – a common disagreement that too often obstructs the speedy resolution of SIRVA cases. Thus, it is not unreasonable to apply a baseline six-figure "yardstick" to SIRVA pain and suffering demands in cases involving surgery (although one that can be rebutted) – and for those reasons, the best comparables under the circumstances are cases involving surgery.

Here, the comparable cases offered are not all of equal utility. Although a surgical case, *Shelton* involves a unique set of facts and circumstances, including an initial delay of *five months* before any complaint of pain and an additional three-month delay before further treatment was pursued. *Shelton*, 2021 WL 2550093, at *7. *Hunt* was also a SIRVA case featuring surgery which resulted in pain and suffering close to, but not in excess of $100,000.00. But that petitioner's SIRVA was described as mild to moderate for the initial six weeks after vaccination, and mild thereafter. *Hunt*, 2022 WL 2826662, at *9. Ms. Hunt had surgery approximately six months post-vaccination, was noted to have "benefited from significant reduction in her pain following each cortisone injection . . . resulting in periods of little-to-no pain during the course of her injury . . . ." and returned to baseline approximately fourteen months after vaccination. *Id.* at *8-9. The *Hunt* petitioner also responded very well to the corticosteroid injections, had periods of little-to-no pain, and her mostly mild treatment course only lasted about fourteen months. Thus, *Hunt* is also unique and distinguishable.

Conversely, at the motions hearing, counsel for Petitioner acknowledged that Petitioner's request for $170,000.00 was high. Moreover, most of the cases cited by Petitioner involved petitioners who required multiple surgeries or had substantiated permanent shoulder disabilities; thus, these cases likewise provide little utility or guidance in this case. *See* cases cited *supra* note 6.

The cases most analogous to the circumstances herein, are *Rafferty*, *Wilson*, *Blanco* and *Nute* (which was cited by Petitioner).[8] The *Rafferty* petitioner had a minor

---

[8] *Rafferty v. Sec'y of HHS*, No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020) (awarding $127,500.00 in pain and suffering); *Wilson v. Sec'y of HHS*, No. 19-0035V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. Mar. 18, 2021) (awarding $130,000.00 in pain and suffering); *Blanco v. Sec'y of HHS*, No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020) (awarding $135,000.00 in pain and suffering). *Nute*, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $125,000.00 for past pain and suffering);

delay in treatment, 30 total PT sessions, arthroscopic surgery with significant improvement within two months, and an overall course was approximately 11 months. Ms. Rafferty was also mother of twin three-year-old sons, one of whom had autism, and was unable to care for her sons. *Rafferty*, 2020 WL 3495956, at *15-16. In *Wilson*, the petitioner sought treatment within one month of vaccination, 18 PT sessions, an MRI, and arthroscopic surgery, from which she made a very good recovery. *Wilson*, 2021 WL 1530731, at *3-5 Ms. Wilson's symptoms were largely resolved after a year, with significant gaps in treatment thereafter. Here, Ms. Majerus sought treatment very shortly after vaccination (two weeks), and the duration of her treatment was more than twice as long as the petitioners in *Rafferty* and *Wilson*.

In *Blanco*, the petitioner sought treatment within one month of vaccination, her treatment course was over two years including more than 40 PT sessions, four steroid injections, three MRI scans, massage therapy, acupuncture, and arthroscopic surgery, after which she substantially recovered. *Blanco*, 2020 WL 4523473, at *2. That petitioner required more extensive treatment than Ms. Majerus, although the temporal duration of Ms. Majerus's course was longer, with a more significant impact on her family and employment. In *Nute*, the petitioner (also a nurse like Ms. Majerus) had three painful cortisone injections, arthroscopic surgery, more than 30 PT sessions, and her overall course was approximately 11 months. *Nute*, 2019 WL 6125008, *at 12. Ms. Nute's employment was impacted similar to Ms. Majerus, but this case warrants a higher award, again due to the lengthy duration of Ms. Majerus's treatment course. While none of these cases are completely parallel, the degree of factual similarity between these cases suggests an award of pain and suffering in the same range.

Overall, this case is a moderately-severe SIRVA case involving surgery. Significantly, Petitioner's overall course lasted two and a half years. Respondent noted two gaps in Petitioner's receipt of medical treatment, totaling approximately ten months, and argued that they counsel in favor of a lower award. While treatment gaps often bear on severity of injury, in this case it is well-documented that Petitioner's gaps were attributable to her workers' compensation claim and appeals, which prohibited her from receiving treatment. Thus, the contemporaneous medical records indicate that Ms. Majerus would have received physical therapy and possibly surgery more than a year and half prior to her actually having surgery absent litigation over the claim. *See* Ex. 3 at 112, 120; Ex. 4 at 11; Ex. 17 at 5.

Moreover, as Dr. Mandel stated, Petitioner's delay in treatment actually resulted in her having persistent symptoms and exacerbation of symptoms. *See* Ex. 3 at 113. Thus, Petitioner's gaps in treatment related to the workers' compensation claim delays involuntarily and unnecessarily *increased and prolonged* Petitioner's suffering. Ms. Majerus would not have had to pursue a workers' compensation claim but for her SIRVA,

and her award should not be reduced for the delay, since the record establishes that the SIRVA was the *proximate cause* of that delay.

My award also takes into account the impact Petitioner's SIRVA had on her employment. Although no lost wages claim has been made, Petitioner has substantiated the impact her SIRVA has had on her life both personally with her family, and professionally in terms of work limitations and changing jobs. But I do not find that Petitioner's stated inability to work in the ICU context is corroborated sufficiently by independent evidence, such as termination, or no longer being allowed to work in the ICU, to give it substantial weight in the amount I am awarding.

### Conclusion

For all of the reasons discussed above, and based on consideration of the record as a whole, **I find that $135,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[9]

Accordingly, **I award Petitioner a lump sum payment of $135,000.00 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required.  *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.